Patricia McCARDLE, Plaintiff–
Appellant–Cross–Appellee,

v.

Jonathan HADDAD, Defendant–
Appellee–Cross–Appellant.

Nos. 1613, 2040, Dockets
96–9133(L), 96–9503.

United States Court of Appeals,
Second Circuit.

Argued June 6, 1997.

Decided Nov. 21, 1997.

44

Norman A. Pattis, New Haven, CT (Williams, Polan & Pattis, on the brief), for Plaintiff–Appellant–Cross–Appellee.

Martin S. Echter, Deputy Corporation Counsel, New Haven, CT, for Defendant–Appellee–Cross–Appellant.

Before: KEARSE and CALABRESI, Circuit Judges, and MUNSON, District

Judge*.

KEARSE, Circuit Judge:

Plaintiff Patricia McCardle appeals from so much of a judgment and supplemental judgment (collectively "judgment") of the United States District Court for the District of Connecticut, Alfred V. Covello, *Judge,* as awarded her $1.00 in nominal damages and $0.33 in attorneys' fees on her claim under 42 U.S.C. § 1983 (1994) against defendant Jonathan Haddad for violation of her right under the Fourth Amendment to the Constitution to be free from unreasonable searches. Judgment was entered following a jury verdict finding that McCardle's automobile had been unreasonably searched, but awarding no damages. On appeal, McCardle contends that the district court erred (1) in failing to instruct the jury that it could award her punitive damages, and (2) in calculating her award of attorneys' fees. Haddad cross-appeals, contending that he was entitled to judgment as a matter of law either because his actions did not violate the Fourth Amendment or because he was entitled to qualified immunity. For the reasons that follow, we reject Haddad's contention that there was no violation, and we conclude that his defense of qualified immunity was not properly preserved. We also reject McCardle's contentions that she was entitled to have the jury instructed on punitive damages and was entitled to an award of substantial attorneys' fees.

## I. BACKGROUND

The events that gave rise to this lawsuit occurred on March 24, 1992. McCardle was employed part-time by the Connecticut Department of Corrections as a drug counselor and part-time as a clerk in a bookstore. Haddad was a police officer of the City of New Haven, Connecticut. As McCardle was driving in New Haven that afternoon, she was stopped by Haddad and given citations for various traffic infractions. McCardle brought the present action, contending that Haddad stopped her and searched her car in

violation of her rights under the Fourth Amendment.

The testimony at trial presented sharply conflicting versions of what happened during the stop. Except in recounting Haddad's testimony, we describe the evidence with respect to the claim of illegal search in the light most favorable to McCardle, as the party in whose favor the jury found on that claim and against whom judgment is sought as a matter of law.

### A. *The Events*

At approximately 5:00 p.m. on March 24, 1992, McCardle was driving to her bookstore job. As she drove along Edgewood Avenue, several young men were standing in the street, blocking her way. McCardle slowed and stopped to avoid hitting them; as they moved to the sidewalk, she rolled down her window and upbraided them for having blocked the street. After McCardle resumed driving, she immediately noticed a patrol car following her and signaling her to pull over.

Haddad, the driver of the patrol car, testified that when he first saw McCardle's car, it was stopped in the middle of a traffic lane, near a corner known for heavy drug activity. He saw several young black males standing facing the driver's side of McCardle's car; the closest was a few feet away from her car, looking in the window. When Haddad turned the corner onto Edgewood Avenue, the males quickly walked away. McCardle began to accelerate quickly, whereupon Haddad signaled her to pull over. Haddad testified that he had not seen anything pass between McCardle's car and the young men.

When McCardle pulled over and stopped, Haddad approached her window and asked to see her driver's license and registration, which she gave him along with her wallet, telling him that her license had expired. Haddad instructed McCardle to step out of her car and said to her, "You just copped drugs. Where are the drugs? Where are the needles? You just copped drugs." He

* Honorable Howard G. Munson, of the United States District Court for the Northern District of New York, sitting by designation.

said, "Nobody stops on Edgewood Avenue unless they're copping drugs."

At Haddad's request, McCardle got into the back of his patrol car. The back was separated from the front seats by metal grill-work. McCardle testified that she did not remember there being any interior handles on the back doors; Haddad testified that he did not know whether or not there were such handles. According to Haddad's trial testimony, McCardle was not under arrest or in custody:

Q. .... [T]his was an arrest, or a custodial stop, at least, and an investigation?

A. No, sir.

Q. She wasn't in custody?

A. No, sir.

Q. She was free to leave?

A. Absolutely.

Q. So if from the back of that car with the grill and possibly without a [back door] handle she said I want to go, you would have let her go?

A. Absolutely.

(Trial Transcript ("Tr.") 122.)

McCardle testified that, from the back seat of Haddad's car, she watched Haddad return to her car, thrust his head and most of his body inside, and search it for approximately 10 minutes. She could see him look beneath the seats and into the compartments on the driver's side. When Haddad returned to his car, he inquired about McCardle's Department of Corrections identification card—which had been in McCardle's wallet when she handed it to him—asking, "Are you a guard?" After McCardle explained that she was a part-time drug counselor, Haddad asked, "So how do you get to get a badge if you're a counselor?" McCardle testified that she had not mentioned having a badge; that when she was off duty, as she was when stopped by Haddad, she kept her badge in the glove compartment of her car; and that the badge was still in that compartment when she eventually returned to her car. Accordingly, McCardle inferred that Haddad had also searched the car's glove compartment.

Haddad, in contrast, denied at trial that he had conducted any search whatever. He testified that he understood that at the time he stopped McCardle he could lawfully have "patted her down" to check for a weapon, but he stated that he did not do so. He also said he understood the plain-view exception to the Fourth Amendment's warrant requirement, and he testified that he did not inspect the car except to look into it from the outside for objects in plain view:

Q. ... in fact, you were aware, based on your skill and training and experience as a police officer, that you needed a warrant to search an automobile, or that there were certain exceptions that might apply?

A. Correct.

Q. And one of them is the so-called plain view exception, right; that's what you were trained?

A. Correct.

Q. So you walked around the car looking in the windows to see if you saw anything that was suspicious, fair enough?

A. I don't know if I walked around it, but I looked in it.

Q. Did you see anything suspicious?

A. No.

Q. What did you do other than looking in the car?

A. I had it towed.

Q. What did you do with respect to the car? Did you go in it?

A. No.

Q. Did you check what was under the seat?

A. No.

Q. Did you look in the glove box?

A. No.

Q. Look behind in the back seat?

A. No.

Q. How carefully did you search the interior of the car when you looked at it from outside?

A. I did not search the car.

(Tr. 126–27.)

Haddad eventually issued McCardle various traffic tickets. He did not allow her to drive her car away because she had no cur-

rent license, and he caused a private towing company to be called to tow the car. McCardle eventually left with the tow truck driver.

## B. *The Decisions Below*

McCardle commenced the present action in 1994 pursuant to 42 U.S.C. § 1983, alleging that both the stop and the search violated her Fourth Amendment rights, and requesting compensatory damages, punitive damages, and attorneys' fees. At the close of the evidence at trial, the district court refused to instruct the jury that it might award McCardle punitive damages. The case was submitted to the jury only on her claims for compensatory damages.

The jury found that McCardle had failed to establish by a preponderance of the evidence that Haddad's stop of her car constituted an unreasonable seizure; but it found that Haddad had violated her Fourth Amendment rights by searching the car. On the latter claim, however, the jury awarded no damages. The district court eventually entered judgment in McCardle's favor on the unlawful search claim in the amount of $1 as nominal damages.

Following the conclusion of the trial, as discussed in Parts II.A. and B. below, Haddad moved for judgment dismissing the unlawful search claim as a matter of law. The district court denied the motion. As discussed in Part II.D. below, McCardle moved pursuant to 42 U.S.C. § 1988 (1994) for attorneys' fees and costs in the amount of $5,330. In an endorsed order dated October 15, 1996 ("Fee Order"), the court stated that, "[c]onsidering the amount of damages awarded compared to the amount sought, ... the plaintiff's degree of success was minimal." Fee Order. It awarded McCardle "$0.33 dollars in attorney fees and costs, this representing one third of the judgment." *Id.*

## II. DISCUSSION

McCardle has appealed, challenging the district court's refusal to instruct the jury that it could award her punitive damages, and contending that the court erred in limiting her award of attorneys' fees to 33 cents. Haddad has cross-appealed, contending that

he was entitled to judgment as a matter of law dismissing McCardle's claim for unconstitutional search, principally on the ground that the search was lawful. He adds a terse assertion that, alternatively, he was entitled to dismissal on the ground of qualified immunity. Because Haddad's arguments, if accepted, would moot McCardle's contentions, we turn first to the cross-appeal.

## A. *Legality of the Search*

Haddad contends in this Court, as he did in motions in the district court during and after trial, that as a matter of law the search of McCardle's car was lawful. In considering such a claim, we may reverse the denial of a motion for judgment as a matter of law "only if we can conclude that, even making all credibility assessments and drawing all inferences against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). We note that Haddad contends that, because the jury found in his favor on McCardle's claim of an unlawful stop, we must view all of the evidence relevant to that claim in the light most favorable to him. We reject this contention, for McCardle does not challenge the dismissal of her claim of unconstitutional stop. The jury was entitled to find against McCardle on that claim if any of its elements was unproven, including those elements not essential to the claim of unlawful search. It may, for example, have found that, as Haddad testified, McCardle was not arrested, and that, given that she had no current driver's license, Haddad's detention of her was only minimally intrusive. The jury's general verdict did not conclusively resolve any of the fact issues relevant to the claim of unconstitutional stop. However, because the jury found in favor of McCardle on her claim of unlawful search, it necessarily found each element of that claim established, and we must therefore take all of the evidence pertinent to that claim in the light most favorable to her. We of course review legal rulings *de novo.*

It is well established that a warrantless search is " '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *see, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). If it is established that the place or object subjected to the warrantless search is one in which the plaintiff has a reasonable expectation of privacy, the defendant has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement. *See generally Schneckloth v. Bustamonte,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Kon Yu–Leung,* 910 F.2d 33, 41 (2d Cir.1990); *United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). The principal exceptions include searches on consent, *see, e.g., Schneckloth v. Bustamonte,* 412 U.S. at 222, 93 S.Ct. at 2045; searches incident to a lawful custodial arrest, *see, e.g., New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862–63, 69 L.Ed.2d 768 (1981); *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471–72, 38 L.Ed.2d 427 (1973); inventory searches of the property of a person who has been lawfully arrested, *see, e.g., Colorado v. Bertine,* 479 U.S. 367, 371–72, 107 S.Ct. 738, 740–41, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 3098–99, 49 L.Ed.2d 1000 (1976); searches based on evidence lying in plain view, *see, e.g., Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987); and automobile searches based on probable cause to believe the vehicle contains contraband or evidence, *see, e.g., California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

A limited search for weapons, without a warrant and without probable cause, is also permissible in connection with a lawful custodial interrogation that does not rise to the level of an arrest, *see, e.g., Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968) ("*Terry* "), on the rationale that "[i]f a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested," *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). Further, the suspect need not actually be dangerous to validate such a limited-purpose search, so long as the officer has a reasonable belief that the suspect poses a danger and may have a weapon within his reach. In *Long,* the Court stated that

> protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger.... [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049, 103 S.Ct. at 3480–81 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–80). Thus, where there has been a *Terry* stop of an automobile, the officer may "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881; *see Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), provided that the officer "has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.' " *Michigan v. Long,* 463 U.S. at 1047, 103 S.Ct. at 3479 (quoting *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881–82).

Such a search, however, must be "limited in scope to this protective purpose." *Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. at 1923. "Nothing in *Terry* can be understood to allow a generalized 'cursory search,' " *Ybarra v. Illinois,* 444 U.S. 85, 93–94, 100 S.Ct. 338, 343–44, 62 L.Ed.2d 238 (1979), for in the absence of arrest, probable

cause, or a search warrant, the officer's right to search for weapons must be balanced against the individual's right to privacy, *see Michigan v. Long*, 463 U.S. at 1046–47, 103 S.Ct. at 3479–80. "[T]he balancing required by *Terry* clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* at 1051, 103 S.Ct. at 3481–82. Thus, whereas an area search incident to a lawful arrest is, by reason of the arrest, lawful regardless of whether the officer has any subjective fear or suspicion as to the presence of weapons, *see, e.g., United States v. Robinson*, 414 U.S. at 235–36, 94 S.Ct. at 476–77; *id.* at 235, 94 S.Ct. at 477 ("It is the fact of the lawful arrest which establishes the authority to search . . . ."), the *Michigan v. Long* Court made it clear that to validate a protective "area search" incident to a *Terry* stop, the officer "must have an articulable suspicion that the suspect is potentially dangerous," 463 U.S. at 1052 n. 16, 103 S.Ct. at 3482 n. 16.

In ruling that the officers in the case before it had acted lawfully when they took preventive measures to ensure that no weapons would be within the suspect's immediate grasp as he reentered his automobile, the *Long* Court "stress[ed] that [it did] not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop. . . . 'The sole justification of the search . . . is the protection of the police officer and others nearby. . . .' " *Id.* at 1049–50 n. 14, 103 S.Ct. at 3481 n. 14 (emphasis in original) (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. at 1883–84). The Court stated, "we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation 'at close range,' " *Michigan v. Long*, 463 U.S. at 1052, 103 S.Ct. at 3487 (quoting *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881–82), and "we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*," *Michigan v. Long*, 463 U.S. at 1050 n. 14, 103 S.Ct. at 3481 n. 14. *See also id.* at 1053 n. 16, 103 S.Ct. at 3482 n. 16 ("our opinion clearly indicates that the area search that we ap-prove is limited to a search for weapons in circumstances where the officers have a reasonable belief that the suspect is potentially dangerous to them"); *Maryland v. Buie*, 494 U.S. 325, 334–35 n. 2, 110 S.Ct. 1093, 1098 n. 2, 108 L.Ed.2d 276 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk [of persons or areas] for weapons can be conducted.").

Under these principles, Haddad's contention that his search of McCardle's car was permissible as a matter of law was properly rejected. There was no evidence to suggest that Haddad had probable cause to conduct a search. Further, Haddad testified that McCardle was not arrested and that an inventory search would have been inappropriate because he never took custody of her car; and his attorney withdrew his pretrial contention that McCardle had consented to the search. Nor was there evidence that Haddad permissibly made a search of the car for weapons incident to his *Terry* stop, for he did not, as required by *Michigan v. Long*, articulate any facts to show that he possessed a reasonable belief, or indeed any belief whatever, that McCardle posed any danger. He did not testify, for example, that he had considered her dangerous or suspected the presence of weapons. Rather, he testified that when she exited the car at his request, he did not pat her down; he did not go through her pockets; and he did not ask her to pull her pockets inside out. Moreover, though he had made no check for weapons on her person, Haddad testified that while he was waiting for a response from police headquarters to his inquiry as to whether there were any warrants outstanding against McCardle, he sat in his car with her.

Haddad surely did not articulate any facts that could show that he reasonably believed that McCardle might gain immediate control of a weapon in the glove compartment or other areas of her own car while she was secured in the back of his car. Nor did he indicate that he had sought to guard against McCardle's gaining access to a weapon in her car upon her release from his car. Indeed,

he testified that he would not allow her to drive her car and had arranged for it to be towed away. Rather, as described in Part I.A. above, Haddad took the position that he had merely looked in the car and had seen nothing suspicious; that he never entered it; and that he had conducted no search whatever. In addition, he testified:

> Q. .... And it's your testimony today that you never searched the car—
> A. Correct.
> Q. —to look for drugs?
> A. Correct.
> Q. Or a gun?
> A. Correct.
> Q. Or to determine if your safety was in danger?
> A. That's correct.

(Tr. 152.)

The district court instructed the jury, in essence, that it should find against McCardle on her claim of unreasonable search if it found that Haddad, after stopping her car, believed that McCardle was dangerous and might gain immediate control of weapons. From the jury's finding that Haddad did search the car, and from his steadfast testimony that he had not done so, along with his testimony that he had taken no steps whatever to determine whether McCardle had or had access to a weapon, the jury was free to infer that Haddad had possessed no belief that a protective search was necessary or even advisable in order to protect himself or others while he was dealing with McCardle. The district court properly rejected Haddad's contention that his search of the car was permissible as a matter of law.

### B. *Qualified Immunity*

■ Haddad's "alternative[ ]" contention, *i.e.*, that he was entitled to judgment dismissing McCardle's claim for unlawful search as a matter of law on the ground of qualified immunity, is presented in a half-sentence of text, stating that "it cannot be said that no reasonable police officer in [Haddad's] circumstances would have conducted such a search" (Haddad brief on appeal at 16), accompanied by a one-sentence footnote (*id.* n. 3) " 'The objective reasonableness test is

met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions.' " (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (in turn quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986))). Even assuming that this terse presentation would otherwise suffice to call for our review of the merits of such a defense, we conclude for the reasons that follow that Haddad waived this defense in the district court.

■ Qualified immunity, which shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), is an affirmative defense that must be asserted in the official defendant's answer and proven by the defendant, *see, e.g., Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980); *In re State Police Litigation*, 88 F.3d 111, 123 (2d Cir. 1996). Early resolution of the defense is encouraged, and a defendant may properly move for summary judgment dismissing the plaintiff's claim on that basis where there are no factual issues material to the defense requiring a trial. Where the qualified immunity defense has not been resolved prior to trial, it may be presented to the jury or it may be decided by the court as a matter of law. *See, e.g., Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir.1995) (*"Blissett "*).

■ If the case proceeds to trial, the defense cannot properly be decided by the court as a matter of law unless the defendant moves for judgment as a matter of law ("JMOL") in accordance with Fed.R.Civ.P. 50. Under Rule 50(a), a party may move for JMOL during trial at any time prior to the submission of the case to the jury. "Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R.Civ.P. 50(a)(2). After the jury has returned its verdict, Rule 50(b) allows a party to "renew" his motion. There is no provision

for a JMOL motion to be made for the first time after trial. *See, e.g., Holmes v. United States,* 85 F.3d 956, 962 (2d Cir.1996). And even when a preverdict motion for JMOL has been made, the movant may not add new grounds after trial. The posttrial motion is limited to those grounds that were "specifically raised in the prior motion for [JMOL]." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993); *see Cruz v. Local Union No. 3,* 34 F.3d 1148, 1155 (2d Cir. 1994) (same); *Lambert v. Genesee Hospital,* 10 F.3d 46, 53–54 (2d Cir.1993) ("the specificity requirement is obligatory"), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 368 (2d Cir.1988). In sum, a posttrial motion for JMOL can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury.

The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, *see, e.g., Blissett,* 66 F.3d at 538–39; *Lewis v. Kendrick,* 944 F.2d 949, 953 (1st Cir.1991), or by failure to raise it with sufficient particularity, *see, e.g., Blissett,* 66 F.3d at 538–39; *Buffington v. Baltimore County,* 913 F.2d 113, 120–22 (4th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); *Walsh v. Mellas,* 837 F.2d 789, 799–800 (7th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). In *Blissett,* for example, the defendants had asserted as an affirmative defense in their answer that their challenged acts or omissions "resulted from [defendants'] good faith and reasonable belief that" those acts or omissions "would not violate any of plaintiff's federally protected rights." 66 F.3d at 538 n. 1. They did not, however, move for summary judgment on the ground of qualified immunity. Nor was qualified immunity the subject of any other pretrial motions, or of discovery, or of pretrial discussions with the court. The defendants did not mention qualified immunity in their pretrial memorandum specifying the issues of fact and law to be resolved; nor did they propose any jury instructions with regard to that defense. Shortly after the start of the trial, following jury selection, the district court *sua sponte* questioned whether there was a qualified immunity issue in the case. Receiving no clear affirmative answer, the court ruled that the affirmative defenses asserted were too general to present a qualified immunity defense, and that, as that defense had not been raised at any other time, it was waived. The court adhered to this ruling after reargument, when defense counsel failed to articulate the defense in better than general or inapposite terms. On appeal, we reviewed this record and held that there was "no error in the district court's ruling that the qualified immunity defense had been waived." *Id.* at 539; *see also id.* (after district court's ruling, the defendants also made no attempt to amend their pretrial memorandum or proposed jury charge, and made no motion for JMOL on the basis of qualified immunity during or after trial). *Accord Walsh v. Mellas,* 837 F.2d at 799–800 (where the defendants asserted the qualified immunity defense in their answer but "failed to bring the argument to the [district] court's attention, despite their having had numerous opportunities to do so" in pretrial and posttrial motions and in numerous hearings, the "defendants abandoned the defense").

In *Blissett,* we further found it significant that the defendants had "never articulated a qualified immunity defense distinct from their contention—the heart of their defense throughout these proceedings—that no constitutional violation occurred." 66 F.3d at 539. "Whether this was a matter of strategy or mere inadvertence [was] of no consequence" in our consideration because the defendants "still failed to raise [the defense] apart from their defense on the merits." *Id.* (internal quotation marks omitted). Similarly, in *Buffington v. Baltimore County,* the Fourth Circuit ruled that even the timely assertion of a qualified immunity defense is not sufficient to preserve the defense where it "hinges ... wholly on the lack of a constitutional violation," rather than on the contention that "the[ defendants'] conduct did not violate clearly established constitutional law of which a reasonable officer would have known." 913 F.2d at 120. Such a defense "does no more than assert that these individual defendants were entitled to qualified immunity because, *on the merits,* there was no

constitutional violation." *Id.* at 120–21 (emphasis in original). The *Buffington* court concluded that the defendants had not "properly preserved and raised ... an issue of qualified immunity distinct from the question of whether a constitutional violation occurred." *Id.* at 122.

In the present case, we find similar failures on the part of Haddad. His answer asserted several affirmative defenses, including the following:

> *SECOND AFFIRMATIVE DEFENSE*
>
> At all relevant times, the defendant was acting within the scope of his duties under the law and their [*sic*] conduct was reasonable and in good faith and did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, and he is, therefore, immune from liability for damages herein.
>
> . . . .
>
> *SEVENTH AFFIRMATIVE DEFENSE*
>
> The defendants [*sic*] is are [*sic*] entitled to qualified immunity.

(Answer at 3–4.) Insofar as McCardle's claim of unlawful search is concerned, Haddad did not pursue his qualified immunity defense. He made no motion for summary judgment on the basis of qualified immunity. Nor has he called to our attention any part of the record showing that the issue was the subject of any other pretrial motion, or of discovery, or of conferences with the court. There was no reference to qualified immunity in Haddad's pretrial memorandum to the court, nor any mention of it in his proposed jury instructions.

At trial, following the close of the defense case, Haddad's counsel made what he called a "motion for judgment of acquittal" (Tr. 158), and proceeded to argue that "on the issue of illegal *stop* here, that the evidence compels a ruling for the Defendant either on the actual case or on the issue of qualified immunity, which is ultimately to be decided by the Court unless there are disputed issues to be resolved by the jury." (*Id.* (emphasis added).) While counsel also proceeded to argue that as a matter of law the search too

was lawful, no mention whatever was made of qualified immunity with respect to the claim of illegal search.

Although Haddad moved after trial for JMOL dismissing McCardle's claim of unlawful search and briefly mentioned qualified immunity as one ground for that relief, that motion was improper to the extent that it sought to invoke qualified immunity because no motion for JMOL on that basis had been directed to the claim of unlawful search at trial. Accordingly, Haddad's defense of qualified immunity with respect to the claim of unlawful search had plainly been waived. Since such a defense would have been difficult to establish in light of McCardle's clearly established rights, as reflected in our discussion of *Michigan v. Long* in Part II.A. above, and since Haddad has made no showing that consideration of the defense is necessary to prevent a "manifest injustice," *see, e.g., Rodick v. City of Schenectady*, 1 F.3d 1341, 1347 (2d Cir.1993), we decline to address its merits.

Having rejected Haddad's contentions that he was entitled to judgment in his favor as a matter of law, we turn to McCardle's contentions that the judgment entered in her favor was flawed.

*C. Jury Instructions on Damages*

McCardle contends first that the district court erred in refusing to instruct the jury on the question of punitive damages. We see no error.

▇▇▇▇ A party is not entitled to have the court give the jury an instruction for which there is no factual predicate in the trial record. *See, e.g., Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir.1997); *Gadaleta v. Nederlandsch–Amerekaansche Stoomvart*, 291 F.2d 212, 214 (2d Cir.1961); 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2556, at 448 (2d ed.1995). In order to justify an award of punitive damages, the defendant's unlawful conduct must surpass a certain threshold. *See, e.g., Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). A jury may be permitted to award punitive damages in a § 1983 action when it finds that the defen-

dant's violation of federal law was intentional, *see, e.g., id.* at 51, 103 S.Ct. at 1637–38, or "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," *id.* at 56, 103 S.Ct. at 1640; *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir. 1989) (affirming vacatur of jury award of punitive damages in absence of evidence of evil motive or intent). Consequently, a plaintiff is not entitled to an instruction allowing the jury to award punitive damages unless there is evidence that the defendant's conduct could be so characterized.

▆ In the present case, while the jury was entitled to conclude that Haddad's search of McCardle's automobile exceeded his legal authority, the evidence was not sufficient to support a finding that Haddad had acted with malice or any other evil motive. Indeed, McCardle testified that as Haddad was about to give her a citation for several infractions, she asked him to give her a break, and that although he said that to do so might jeopardize his job, he did in fact give her a break by crossing off one of the charges he had written onto the ticket.

Nor are we persuaded by McCardle's argument that because Haddad's search of the car was in violation of clearly established Fourth Amendment principles, his conduct *ipso facto* revealed reckless or callous indifference to her rights. To accept that proposition would essentially expose a defendant to an award of punitive damages for any conduct not protected by qualified immunity, and would thereby make the availability of punitive damages equal to the availability of compensatory damages. That proposition is contrary to the principles discussed above.

We conclude that the district court properly ruled that the evidence as to Haddad's conduct could not justify an award of punitive damages.

### D. *Attorneys' Fees*

▆ Finally, McCardle argues that the district court erred in denying her application for an award of attorneys' fees and costs in the amount of $5,330. In awarding instead just 33 cents, the court, citing *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), stated principally that "[c]onsidering the amount of damages awarded compared to the amount sought, ... the plaintiff's degree of success was minimal." Fee Order. We review a district court's ruling on attorneys' fees for abuse of discretion, *see, e.g., Caruso v. Forslund,* 47 F.3d 27, 31 (2d Cir.1995); *LaRouche v. Kezer,* 20 F.3d 68, 71 (2d Cir.1994), and though we are skeptical of part of the court's rationale, we uphold the ultimate denial of the application for $5,330 in light of *Farrar v. Hobby.*

Although the primary consideration in assessing a fee request is the "'degree of success obtained,'" *Farrar v. Hobby,* 506 U.S. at 114, 113 S.Ct. at 574 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)), we question the district court's assessment that McCardle's success was minimal in comparison to "the amount [she] sought." McCardle's complaint requested compensatory and punitive damages simply "in an amount th[e] Court shall consider to be just and fair." (Complaint ¶¶ A, B.) At trial, McCardle testified that, although she was seeking monetary damages, it was more important to her to vindicate her contention that her rights had been violated. On direct examination, she testified as follows:

Q. Why did you bring this suit, Ms. McCardle?

A. I brought this suit because from the time that it happened to this very moment, I knew that how the officer treated me was wrong. I knew that he had no right to search my car, and that he represents me, too. He represents me as a citizen of New Haven, America, and he did not act like he represented me. He did not listen to one word that I said.

Q. Do you have any feelings one way or another about whether the jury awards you money damages?

A. No, I do not.

(Tr. 36.) On cross-examination, she testified similarly:

Q. And did I understand you to testify in response to your attorney's question that you have no interest at all, no interest

at all, in whether you get money out of this?

A. That was never the purpose of this suit.

Q. So you really have no interest at all?

A. It was never the purpose of this suit.

Q. It's not a motivating factor?

A. No, it's not.

(Tr. 59.) Finally, during his closing arguments, counsel for McCardle briefly addressed the issue of damages as follows:

Ms. McCardle's father was a law enforcement officer. She grew up with respect for the law. She works in the Department of Corrections. She had expectations of how police officers would behave. Those expectations were dashed that night. The measure of the economic worth of this case, assuming it has any in your mind, is the level that falls from what she was taught to expect, and what she got.

(Tr. 173.)

And as to damages, do what you will. You heard Ms. McCardle. She doesn't care one way or the other. I'm a lawyer, but I represent her. I always want to get paid. But it's her case. Consider the issue of liability. If you reach liability, give her what you think is just.

(Tr. 188.)

In light of McCardle's request for compensatory damages in whatever amount the jury felt was just for her "dashed" expectations as to the behavior of police officers, we think it difficult to say that any award by the jury could be deemed larger or smaller than the amount sought.

■ Nonetheless, we conclude that the district court's denial of a greater fee was not inappropriate in light of the prevailing authorities, including *Farrar v. Hobby.* In a § 1983 action, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee." 42 U.S.C. § 1988(b). "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v.*

*Eckerhart,* 461 U.S. at 433, 103 S.Ct. at 1939 (internal quotation marks omitted). In *Farrar v. Hobby,* the Supreme Court noted that

a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his absolute right to procedural due process through enforcement of a judgment against the defendant.... In a civil rights suit for damages, however, the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury.

506 U.S. at 115, 113 S.Ct. at 575 (internal quotation marks omitted). The Court stated that "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief ... the only reasonable fee is usually no fee at all." *Id.*

Of course, even when damages were sought, the amount of monetary recovery need not be the only measure of the plaintiff's success. In *Carroll v. Blinken,* 105 F.3d 79 (2d Cir.1997), for example, we vacated the district court's refusal to award fees against one of the defendants, indicating that although the plaintiffs had not recovered any damages, they had won equitable relief that was "more than strictly nominal relief," and an award of attorneys' fees was therefore appropriate. *See id.* at 81–82. The modest fee awarded against the other defendant in that case was appropriate even though the equitable relief granted, though more than nominal, was "minimal." *Id.* at 82. Further, in *Cabrera v. Jakabovitz,* 24 F.3d 372, 393 (2d Cir.), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994), we held that civil rights plaintiffs who succeeded in creating a new rule of liability serving a significant public purpose but failed to obtain other significant relief may nonetheless be entitled to attorneys' fees.

On the other hand, we have held that the denial of attorneys' fees was not an abuse of discretion where the plaintiff recovered only nominal damages and received no other meaningful relief. *See, e.g., Pino v. Locascio,* 101 F.3d 235, 238–39 (2d Cir.1996); *Caruso v. Forslund,* 47 F.3d at 31–32. In *Caruso,* we upheld the denial of attorneys' fees to a civil rights plaintiff who received nomi-

nal damages after she had waived, by failure to object to the jury instructions, her claim to punitive damages. The plaintiff had argued that because she sought no compensatory damages, her award of nominal damages was not merely a "technical" victory. *Id.* at 32. We concluded that her argument "fail[ed] because, contrary to plaintiff's contention before this court," and notwithstanding ambiguous responses during cross-examination to the effect that money was not really important and that she just wanted an apology; "damages were sought." *Id.* Since we found no nonmonetary indicia of success, we concluded that it was within the district court's discretion to deny attorneys' fees.

In the present case, though the jury found that Haddad was liable to McCardle for searching her car in violation of her Fourth Amendment rights, it awarded her no compensatory damages, apparently finding that her disillusionment did not warrant a money award. Further, the court had refused to instruct the jury that it could award McCardle punitive damages, because it concluded—properly, as discussed in Part II.C. above—that she had failed to establish the intent, malice, or recklessness required to sustain such an award. Accordingly, McCardle did not succeed in establishing her entitlement to more than nominal damages.

Nor did McCardle receive any other cognizable benefit from this suit. Other than a boilerplate catchall request for such other relief as the court might deem appropriate, the complaint requested only compensatory and punitive damages and attorneys' fees. Her complaint did not request, nor did the district court grant, injunctive relief or declaratory relief that would affect Haddad's behavior toward her. And given the principles plainly enunciated by *Michigan v. Long,* the present suit did not create a new rule.

In sum, we see no meaningful way in which to distinguish the present case, in which the district court granted a nominal fee of 33 cents, from those in which we have upheld the district court's denial of any fee because the plaintiff received only nominal relief. Given McCardle's failure to establish an element required for recovery of punitive damages, and her failure to persuade the jury that she should receive compensatory damages for her disappointment, we conclude that the district court's decision was not inappropriate.

### CONCLUSION

We have considered all of the parties' contentions in support of their respective appeals, and have found in them no basis for reversal. The judgment and supplemental judgment of the district court are affirmed.

Each side shall bear its own costs with respect to these appeals.