**John LEATHER, Plaintiff,**

v.

**Michael TEN EYCK, individually, Thomas Lindert, individually, Carmine Restivo, individually, Daniel Stevens, individually, Robert Thoubboron, individually, and The County of Putnam, New York, Defendants.**

**No. 97 Civ. 06735(CLB).**

United States District Court, S.D. New York.

May 11, 2000.

Jonathan Lovett, Kim Berg, Lovett & Gould, White Plains, NY, for plaintiff.

Anthony J. Servino, Daniel Seymour, Law Offices of Anthony J. Servino, White Plains, NY (James A. Randazzo, Hynes & Randazzo LLP, White Plains, NY, of counsel), for defendants.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

In compliance with the Mandate of the Court of Appeals in *Leather v. Ten Eyck,* 180 F.3d 420 (2d Cir.1999), the issues in this case were tried to a jury beginning on February 7, 2000, resulting in a verdict on February 15, 2000 in favor of Plaintiff against defendants Ten Eyck, Lindert, Restivo and Thoubboron, as well as the County of Putnam. Compensatory damages in the amount of $200,000 were awarded against all Defendants jointly and severally, and punitive damages were imposed in the amount of $2,000 against Michael Ten Eyck, $3,000 against Thomas Lindert, $5,000 against Carmine Restivo, and $435,000 against Robert Thoubboron. The Court had dismissed the case against defendant Daniel Stephens at the close of Plaintiff's case for failure of proof.

Defendants now move for judgment as a matter of law dismissing all the claims, for a new trial on the issues of liability and damages, or in the alternative for a remittitur of the damages award. The motion was fully submitted for decision on March 17, 2000, and decision was deferred pending settlement. Although the case was settled by agreement of counsel, and the

settlement approved by the County Legislature, its Resolution to do so was vetoed by the County Executive, and thereafter the case was reopened.[1] Familiarity of the reader with all prior proceedings had herein and with the prior decision of the Court of Appeals is assumed.

*Liability*

Plaintiff was the Fire Coordinator for the County of Putnam serving at the pleasure of the County Legislature. The individual Defendants were all members of the County Sheriff's Department, Mr. Thoubboron being the elected Sheriff of the County and head of that Department. The lawsuit seeks to recover damages for violation of Plaintiff's right to be free from selective enforcement of the laws, guaranteed to him by the Fourteenth Amendment of the United States Constitution and also to be free from official retaliation for expressing his opinion on a matter of public concern. Plaintiff contended and the trial jury found that in retaliation for expressing his opinion concerning the implementation of a new E–911 system in Putnam County contrary to the opinion of the Sheriff, he was targeted for selective enforcement of the New York State Vehicle and Traffic Laws relating to drunk driving. This Court is considering the motion must give full credence to the jury's verdict without regard to the Court's own opinion as to the truthfulness of any witness, or as to the inferences to be drawn from the evidence.

As a perquisite of his employment as the Fire Coordinator for the County, Mr. Leather was given the 24 hour use of a County owned automobile. Many other County officials and employees enjoyed the same benefit. The County had a rule against operating its vehicles after having imbibed liquor in any quantity.

Mr. Leather, apparently a man of steady habits, followed the regular practice of going to dinner with his wife on Friday evenings at the "Middlebranch," a restaurant and bar since closed, named after the New York City Reservoir of the same name, which was patronized by local officials, and was apparently a place where the elite meet to eat and drink.

On two prior occasions, defendant Ten Eyck, whose specialty was enforcing the laws against driving while impaired with alcohol, stopped Mr. Leather when he was driving home from the Middlebranch Restaurant.[2] On the first such occasion in the summer of 1994, Deputy Ten Eyck warned Mr. Leather, and ordered him to have his wife drive home. On the second occasion he administered three inconclusive breathalyzer tests and called in a village police officer to the scene. No ticket was issued to Mr. Leather and he was not arrested.

**1.** The decision to veto the settlement which was reached in this case after arms length post-trial negotiations between the attorneys for both sides with the aid of this Court, is, of course, entirely within the discretion of the County Executive. It seems, however, as appears from published reports, to be based on certain misapprehensions. First, an appeal will not "vindicate" the Sheriff; at most it could lead to a new trial before another jury, since our Court of Appeals has already declared the law of the case, and this Court followed the Mandate. Secondly, the jury verdict here stands for nothing more than a finding that Plaintiff proved at trial that it was more likely than unlikely that he was targeted for selective enforcement; issues of "guilt" or "innocence" of the Sheriff have no place in a discourse concerning civil litigation. Similarly beside the point are public charges by the Sheriff's personal attorney to the effect that the attorneys selected to defend both the County and the Sheriff in this case were ineffective. This Court knows of no legitimate basis to criticize the quality of the representation furnished to defendants in this trial, and such unfounded criticism of the attorneys may have made more difficult the decision as to whether or not the settlement approval should be vetoed.

**2.** Deputy Ten Eyck received statewide recognition from the Mothers Against Driving organization for 1996, and has made about 350 arrests for Driving While Intoxicated (DWI) or Driving With Ability Impaired (DWAI) and assisted in five or six hundred more such arrests.

Plaintiff's witness David Ryan served as a deputy Sheriff in Putnam County between December 1983 and June 1995. He testified that some time in the late 1980's or early 1990's, at a change of shift, Captain Restivo gave an order to arrest John Leather for drunken driving. The jurors could have inferred that this took place in 1994 because Captain Restivo also mentioned Michael Lambiase as a target and both Leather and Lambiase were on the other side of the then existing public controversy as to how the E–911 system should be administered. Plaintiff claimed others were similarly targeted during this period. There was no evidence in the case of any intention to charge innocent persons with offenses because they engaged in policy disputes with the Sheriff. Rather, the professional courtesy ordinarily extended to public officials in vehicle and traffic matters was withdrawn and the rank and file officers were told that it was "open season" on John Leather and others. While there is no direct evidence that Lindert or Ten Eyck were present when Restivo gave the order, the jury could infer, in the context of a civil trial, that in the day to day operation of a quasi-military outfit, all the rank and file came to know of this.

It was the Plaintiff's initial theory in the case that, knowing of his habit of drinking with dinner at the Middlebranch on Friday evenings, the Sheriff's office had staked out the place, and that defendant Stephens was present in the bar for the purpose of observing Leather and telephoning headquarters when Leather drove home. There was no credible evidence at trial to support that theory. Stephens remained in the Middlebranch long after Leather had left, and there was no evidence that he or anyone else telephoned headquarters. Ryan testified, in the passive mode beloved of law enforcement witnesses, that "a phone call was made." TT at 66. He did not testify that *he* received or overheard such a phone call, or that Stephens made the call, and in truth Mr. Ryan was on leave and not present in headquarters on the night of December 2, 1994. TT at 449.

This was pure hearsay entitled to no weight.

Ryan admits that he had made a public statement to the effect that if he won the lottery, he would spend a million dollars to smear the Sheriff. This information was before the trial jury, and while this Court is somewhat skeptical of Ryan's testimony, the sole judges of credibility and the disputed fact issues were our trial jurors. The trial jurors had the right to believe Ryan's testimony, except as to those events where he was clearly not present and testifying solely based on hearsay or speculation. The jury chose to do so, rejecting the contrary testimony offered by the defendants.

Philip Prinz testified by deposition, portions of which were read to the jury commencing at page 284 of the February 8, 2000 transcript. Mr. Prinz became Undersheriff in January of 1986 and in March of 1996 was told by the Sheriff that he should resign. Prinz admits that he is a friend of Plaintiff and has a dislike for the Sheriff for forcing his retirement. Prinz testified to the public dispute over the E–911 system between Leather and the Sheriff. He also testified that the following occurred at a staff meeting prior to the arrest of Plaintiff:

> "I recall the Sheriff stating at a staff meeting that John [Leather] was a drinker, and that it wouldn't take too much effort to find him and arrest him for DWI."

TT at 297. This occurred just after the public hearings concerning the E–911 system. While Prinz's credibility is also suspect, the jury had the right to believe him, and this Court for purposes of a post-verdict motion cannot substitute its own view on this issue of credibility for the findings of the trial jury.

Accordingly, this Court concludes as a matter of law that there was sufficient evidence at trial to support a finding of selective enforcement as to John Leather, motivated by a publicly expressed shift in

his opinion concerning the proper organization of the new E–911 system in the County of Putnam.

The events leading up to the December 2, 1994 arrest, viewed most favorably to the Plaintiff, as they must be, are set forth below. On Friday, December 2, 1994, Ten Eyck was on motor patrol westbound on State Route 6 at a location three miles from the Middlebranch, between the Middlebranch and the Plaintiff's home, when he observed a Camaro automobile traveling eastbound which had a non-functioning headlight. TT at 488 The vehicle also was speeding as confirmed by radar. Ten Eyck turned his vehicle around and stopped the Camaro. While he was standing in the road at the driver's side door of the Camaro investigating those traffic violations, Sergeant Lindert, on a supervisory tour, came to the scene in his vehicle and parked across the street. He observed that a passing eastbound white car almost hit Ten Eyck, and instructed him to "go get it." Officer Ten Eyck gave back the license to the operator of the Camaro and "told him to slow down and get his headlight fixed."

The passing vehicle was, as the reader has anticipated, operated by Mr. Leather, who was on his way home from the Middlebranch with his wife, having engaged in his regular Friday evening activities. While Mr. Ten Eyck denied under oath that he recognized the vehicle, and it was 9:00 p.m. at the time, and dark, there were lights from the two police vehicles and the passing traffic. Sufficient circumstantial evidence exists in the record to warrant an inference by the jury that Lindert and Ten Eyck at the very least knew it was a County owned vehicle with two people in it, and reasonably believed that it might be driven by John Leather, and that, in accordance with his usual weekly custom, he was very likely driving home from the Middlebranch. The County owned vehicles are white, they are of the same make and model, and the license plate series used for the County vehicles is known to law enforcement officers. Furthermore, John Leather's County owned vehicle had a red fire coordinator's insignia on the front identifying it as Car No. 1. TT at 270–271. Mr. Leather's County car also had a plate above the official plate which read, "All county fire and EMS equipment." TT at 426.

Releasing and leaving a known speeding violator with a defective headlight, Lindert and Ten Eyck both "took off after the vehicle." They followed the Leather vehicle and the car behind it for some distance, and after a half mile observed Leather make a left hand turn onto North Main Street in Brewster. Ten Eyck observed that the vehicle crossed the double yellow line in violation of N.Y. V & T § 1126(a), an offense of which John Leather was later convicted in his trial before Justice Vercollone of the Town of Southeast, at the same time that he was convicted for DWAI (V & T § 1192.1).

Radioing Sergeant Lindert to the effect that he was going to make a traffic stop. Ten Eyck activated the overhead lights and alternate headlights on his vehicle, turned on the siren and blow his airhorn. Eventually, the vehicle pulled over on Paddock Lans at North Brewster Road and immediately after the stop, Mr. Ten Eyck observed Mr. Leather come out of his vehicle and walk towards the police car. The officer observed a strong odor of alcoholic beverage on his breath, glassy eyes, and that he was leaning on the back of the car. Plaintiff admitted that he had had "a couple of drinks at the Middlebranch Restaurant" and the deputy performed a field sobriety test. John Leather asked for professional courtesy (TT at 498) and Sergeant Lindert, who had arrived at the scene by that time "told him to exercise his *Miranda* rights and be quiet, call a lawyer and not to say anything." A blood test was taken within the two hour period permitted by § 1194(2)(a)(2), and traffic tickets were issued for crossing the double yellow line and for DWI. The blood test was returned at .09 per cent blood alcohol,

sufficient to support a prima facie case for DWAI, but not sufficient to support a prima facie case for DWI.[3]

Thereafter, there was a bench trial in the Town of Southeast Justice Court before Justice Vercollone on June 29, 1995 and July 6, 1995, followed by a conviction on August 2, 1995 for DWAI and crossing the double yellow line. No appeal was taken.

This Court previously concluded that the issue of selective enforcement, an absolute defense to a criminal prosecution in New York, had been raised and adjudicated in the trial before Justice Vercollone. The Court of Appeals held otherwise. Mr. Leather testified at this trial as follows:

Q. (By Mr. Seymour) [D]idn't you, in fact, raise through your attorney the issue of selective enforcement at your criminal trial?

A. That issue was raised by my attorney, definitely, yes. (TT at 398)

Whether Mr. Leather did in fact raise the issue of selective prosecution sufficiently to bar that claim in this subsequent litigation by reason of his conviction is purely an issue of law. That issue has been resolved adversely to the defendants by our Court of Appeals. *Leather v. Ten Eyck,* 180 F.3d 420, 426 (2d Cir.1999). The entire record in the Justice Court was available to the appellee in connection with the prior decision of the Court of Appeals and this Court regards the issue to be barred at this trial by reason of the doctrine of law of the case. Plaintiff claims, and it may well be true, that at the time he was tried in the Justice Court of the Town of Southeast, he did not have the benefit of the pretrial discovery in this litigation and the testimony of the witnesses Prinz and Ryan was unavailable, since they were still

working for the Sheriff. The testimony of Leather, a layman, that he did in fact raise the defense adds nothing to the record which was previously before the Court of Appeals in support of this contention, and rejected by that Court.

Thereafter, as might be expected, the conviction received considerable publicity and came to the attention of the County Legislature, which also became informed that its policy which prohibits the drinking of liquor in any quantity prior to operating a County owned vehicle had been violated by John Leather. The Legislators, undoubtedly surprised by the notion that any of its many County officers and employees having 24 hour automobile privileges would drink *any* alcohol and then drive, foreseeably forced the resignation of Mr. Leather from his position as County Fire Coordinator.

This Court concludes as a matter of law that there is adequate evidence in this case, giving full latitude as we must to the jury's right to assess credibility and draw or reject disputed inferences, to support a finding that John Leather was selectively targeted in violation of his constitutional rights. This Court has no legal basis to disturb the finding of liability by our jury, and that portion of Defendants' motion which seeks a new trial on this issue, or judgment notwithstanding the verdict is denied.

*Compensatory Damages*

We then turn to the issue of compensatory damages. Mr. Leather documented substantial direct monetary damages flowing from the Constitutional violation. As a result of losing his job as Fire Coordinator, foreseeably, Plaintiff lost over $22,000 in income for the years 1995 and 1996. TT

---

3. Occasionally drunk drivers in New York have been convicted for so-called "common law" DWI, that is to say with no blood test or with a blood test of less than .10, but this is unusual, and a person charged with DWI is entitled to a trial by jury, while trials involving charges of DWAI are without a jury in New York. Alcohol when ingested begins to enter the bloodstream immediately in part, and at the same time begins to be metabolized by the liver, and excreted through the kidneys and the breath. Numerous variables affect the rates of absorption and elimination of alcohol in the blood, so that the level may vary one way or the other between the time of arrest and the time of the test.

at 377–380. Furthermore, Mr. Leather testified that the Fire Coordinator's salary has been raised significantly since 1996, to "70 to 80 thousand dollars a year." TT at 384. Therefore his lost salary increased to between $50,000 and $60,000 per year. He also lost health insurance and retirement coverage and lost the use of the all-expenses-paid County owned vehicle. Mr. Leather also incurred legal fees in his defense of the criminal trial of $6,000 plus $2,500 for hiring for trial purposes of a consultant on alcohol. TT at 372. As a result of his conviction he had to pay a $300 fine and "go to school." TT at 373. There was a $75 registration fee for traffic school, as well a $25 fee for a temporary driver's license. TT at 373. As of the date of trial, direct damages, estimating reasonable damages releasing to the loss of the health insurance and the County car as well as the salary range between around $200,000 and $230,000, which were mitigated to an extent by the fact that Mr. Leather renegotiated the scope of his work and salary as a paid fire official of the Town of Southeast.

In addition to his direct damages, Mr. Leather endured significant local publicity and notoriety, inflicted on a person who had previously held a good reputation in the community. TT at 381–382. Our jury was permitted to assess compensatory, or heartbalm damages in addition to direct damages for Mr. Leather's loss of reputation and for the mental anguish, shame and humiliation which he endured as a result of the Constitutional violation. The jury was aware of the fact that Mr. Leather really was driving while impaired by alcohol and that he had done it before. Presumably that reduced awareness served to the reduce the compensatory award, in a case which otherwise could have supported a seven figure verdict. Driving under the influence of alcohol is a serious problem, particularly in a community where the roads are narrow and the traffic heavy. To an extent, Leather's own conduct was a concurrent cause of his damages and apparently was so regarded by the jury. The jury expresses the conscience of the community, and this Court must refrain from placing unreasonable restrictions on its power to do so, or second guessing its conclusions.

■ The Court concludes that the finding by the jury of liability, and the award of compensatory damages, in the amount of $200,000, standing alone, is reasonable in the context of the entire case, and may not be disturbed.

*Punitive Damages*

■ The entire issue of punitive damages in this case presents a far more difficult question. This trial record does not support an award of punitive damages in any amount as to defendants Ten Eyck, Lindert or Restivo. In *McCardle v. Haddad*, 131 F.3d 43 (2d Cir.1997), our Court of Appeals held that such damages are appropriate in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." (Citing and quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)); *See also Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir.1989), (cited with approval in *McCardle*,) (affirming vacatur of jury award of punitive damages in absence of evidence of evil motive or intent). The decision in *McCardle* is in accord with the Supreme Court's ruling in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

There is no evidence in this trial record showing that these particular defendants were motivated by evil motive or intent, or reckless or callous indifference to Mr. Leather's rights. There is no evidence of any personal animus of the part of these defendants against Leather, and they should not be subjected to punishment for responding to a suggestion to the rank and file originating from the Sheriff that Leather was a known drinker and ought to

be arrested. They were following orders which appeared facially reasonable. The Sheriff had a known policy of strict enforcement of the laws against drunk driving and no suggestion, order or instruction was ever given to them to procure anything but a *bona fide* arrest supported by credible evidence establishing guilt.

Traffic offenses in New York for the most part, do not require a *mens rea* and have been enforced with discretion on the part of road patrol officers, as well as by prosecutors. So called professional courtesy, under which violations are disposed of by a warning from the road patrol, instead of by arrest or the issuance of a ticket, has been extended regularly throughout the state to police officers and their families and members of the privileged classes such as legislators, judges, physicians, newspaper reporters and other reputable persons, many of whom are issued identifiable license plates on their vehicles. John Leather himself was the beneficiary of such professional courtesy on at least one occasion, which, the jury found, was withdrawn when he clashed with the Sheriff over the E–911 system.

The Court grants judgment to defendants Ten Eyck, Lindert and Restivo, setting aside as unsupported by the evidence so much of the jury verdict which awards punitive damages against them. Alternatively, if our Court of Appeals shall determine on review that there is sufficient evidence to support such an award, this Court concludes that the amounts awarded were excessive and rendered without reference to the Defendants' personal financial condition. Alternatively, a new trial on the issue of such damages is granted.

Insofar as concerns the Sheriff himself, we are constrained by the jury verdict that his conduct was motivated at least in part by personal animus against John Leather and that this animus arose out of protected constitutional activity by Leather. The jury also heard prior similar act evidence offered under Rule 404(b), F.R.E., and disputed by the Sheriff, to the effect that

other political figures opposed to the Sheriff were charged with traffic violations in a similar context. Here again it was never claimed that any of the other persons mentioned in the trial record were innocent of the charges. They were simply denied the professional courtesy which is not uncommonly extended to public officials and others in connection with such offenses.

■ Accepting that punitive damages may be allowed in a case such as this, to further the legitimate interest in punishing unlawful conduct and to deter its repetition (*Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)), this Court concludes that the award of $435,000.00 against defendant Thoubboron is so large as to shock the conscience of the Court, and exceeds the power of our trial jury under the United States Constitution. The jury had no information whatever as to the financial ability of the Sheriff to respond to such a judgment, and may well have been motivated by excessive indignation, or perhaps a desire to punish for indignities visited on persons other than John Leather.

■ Whether a punitive damage award is so large as to shock the conscience of this Court, as this one does, depends on factors which include: (1) our consideration of the degree of reprehensibility; (2) the relationship of the punitive damage award to the compensatory damage award, and; (3) its relationship to the criminal sanctions generally imposed by society for comparable misconduct. *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The amount of punitive damages awarded should not be greater than the amount reasonably necessary to fulfill the twin purposes of punishment and deterrence, otherwise the award is a windfall to the individual litigant. Also, an award should not be "so high as to result in the financial ruin of the defendant." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992) (citation omitted). We now discuss these factors.

While Mr. Thoubboron's tortious conduct as found by the trial jury was sufficient to give rise to tort liability, this Court does not perceive a high level of culpability attaching to his conduct. Denial of professional courtesy to observed violators of the traffic laws in retaliation for speech ranks low on the list of possible abuses of police power when compared with such violations of the public trust as the excessive use of force, racial profiling or framing innocent persons. We cannot overlook the fact that John Leather was in fact a drinker, who drove his County vehicle between the Middlebranch and his residence every Friday night in violation of a statute intended to protect public safety. One who does so does not gain immunity by picking a political fight with the Sheriff.

Courts have measured the unreasonableness or excessiveness of punitive damages awards by comparing them with the actual harm inflicted upon the plaintiff, and it is ordinarily considered that the amount of punitive damages awarded must bear some proportion or some reasonable relationship to the harm actually incurred, as reflected in the compensatory damage award. The award of $200,000 compensatory damages in this case is probably close to the maximum amount that would be upheld by this Court as not excessive under the totality of the circumstances of this case. The much larger punitive award against Thoubboron bears no proportionality to the compensatory award.

The third factor considered is the comparable criminal sanction. An official engaging in selective law enforcement could be prosecuted criminally in a federal court for violation of Chapter 13 of Title 18 of the United States Code—Civil Rights. This Chapter prohibits a person from wilfully subjecting any person to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States. Sentencing Guidelines are established by the United States Sentencing Commission under § 2H1.1 for offenses involving wilful violations of such individual rights. The Guidelines cover a vast number of different possible violations of civil rights, including the right not to be murdered, but the basic federal offense carries a Guideline Level of 6. Thus, the permissible fine imposed under that Guideline Level upon individual defendants (*See* Sentencing Guidelines § 5E1.2) ranges from $500 to $5,000.

Before being required to pay such a fine, a person situated as was the Sheriff, would have been entitled to all the Constitutional safeguards of a criminal trial, including the benefit of the presumption of innocence and a requirement of proof of guilt beyond a reasonable doubt, all of which were lacking here. The punitive damages awarded in this case are in no sense comparable with the sanction imposed by society with due process safeguards, for like conduct in a criminal context.

The punitive damages award here checks the conscience of the Court, and if allowed to stand would constitute a denial of Justice. *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998) (citation omitted). Comparing the possible exposure under the Sentencing Guidelines for a criminal civil rights violation, not present in this case, this Court concludes that the purpose of the jury in imposing punitive damages in this case would be fulfilled by a punitive damages award not to exceed $3,000, against defendant Thoubboron, which the Court finds is the maximum verdict that would be upheld by this Court as not excessive. *Earl v. Bouchard Trans. Co. Inc.*, 917 F.2d 1320, 1330 (2d Cir.1990). See also *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir.1993).

*Remittitur*

This Court may not simply reduce the award of punitives, it must offer Plaintiff a new trial on the issue of damages alone. *Phelan v. Local 305 of the United Ass'n of Journeyman and Apprentices of the Plumbing & Pipefitting Indus.*, 973 F.2d 1050 (2d Cir.1992). The Court exercises its discretion to grant a conditional new

trial limited to the issue of compensatory and punitive damages, unless the Plaintiff, within fifteen (15) days shall execute a written *remittitur* reducing the punitive damages award against defendant Thoubboron to the amount of $3,000. The Court concludes that the punitive damages and the compensatory damages are so closely intertwined in this case that it would be impractical to have a new trial on the issue of the punitive damages alone. At such new trial, Mr. Thoubboron shall be permitted to introduce evidence of his current personal financial condition if he wishes to do so.

Lastly, it is argued that a county is not liable for acts of the sheriff as a policy maker, under New York law. Whether or not that is true appears to be of no moment, because at least as to federal claims the argument is precluded in this Circuit by *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986). In the context of this case the Sheriff is a policymaker for the County.

All other arguments made in support of the motions have been considered and are held to be without merit. Except as set forth herein, the defendants' motions are in all respects denied.

There is pending before this Court an application for legal fees in behalf of the Plaintiff. If the Plaintiff declines to accept the *remittitur*, this Court will defer fixing the legal fees until the retrial of the issue of damages has been concluded. If the Plaintiff accepts the *remittitur*, Plaintiff's counsel may now supplement their existing application to bring the lodestar up to date. No judgment will be entered at this time, pending decision on the application for legal fees.

So Ordered.