# SUPREME COURT OF THE UNITED STATES

## WILLIAM LEE THOMPSON *v.* WALTER A. McNEIL, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 08–7369.   Decided March 9, 2009

JUSTICE BREYER, dissenting from denial of certiorari.

This petition asks us to determine whether the Eighth Amendment's prohibition on "cruel and unusual punishments" precludes the execution of a prisoner who has spent over 30 years on death row. JUSTICE STEVENS and I have previously written that this is a question that merits the Court's attention, see, *e.g., Lackey* v. *Texas*, 514 U. S. 1045 (1995) (STEVENS, J., respecting denial of certiorari); *Foster* v. *Florida*, 537 U. S. 990 (1999) (BREYER, J., dissenting from denial of certiorari); *Knight* v. *Florida*, 528 U. S. 990, 993 (1999) (same), and the delay here is even longer than the delay in those prior cases. Here, petitioner has been on death row for 32 years, well over half his life. For the reasons we have set forth in the past and for many of those added in JUSTICE STEVENS' separate statement, I would grant this petition.

JUSTICE THOMAS suggests that petitioner cannot now challenge the constitutionality of the delay because much of that delay is his own fault—he caused it by choosing to challenge the sentence that the people of Florida deemed appropriate. See *ante*, at 1 (opinion concurring in denial of certiorari). I do not believe that petitioner's decision to exercise his right to seek appellate review of his death sentence automatically waives a claim that the Eighth Amendment proscribes a delay of more than 30 years. See *Gregg* v. *Georgia*, 428 U. S. 153, 198 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (automatic appeal of

all death sentences is "an important additional safeguard against arbitrariness and caprice"). But in any event the delay here resulted in significant part from constitutionally defective death penalty procedures for which petitioner was not responsible. See *Knight, supra,* at 993.

In particular, the delay was partly caused by the sentencing judge's failure to allow the presentation and jury consideration of nonstatutory mitigating circumstances, an approach which we have unanimously held constitutionally forbidden, see *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987). As a result of this error, the Florida Supreme Court remanded for resentencing. See *Thompson* v. *Dugger*, 515 So. 2d 173 (1987).

At petitioner's resentencing, he presented substantial mitigating evidence, not previously presented, that suggested that he may be significantly less culpable than his codefendant, who did not receive the death penalty. Petitioner, for example, introduced an affidavit of Barbara Garritz, who witnessed the crime for which petitioner was sentenced to death. She described petitioner's codefendant Rocky Surace as "an evil man" and "the devil, himself" and explained that he "manipulate[d] people . . . [into] follow[ing] his orders." Tr. 2473 (May 31, 1989). By contrast, she described petitioner as "a big, easy-going child who would do just about anything to please" and who "never seemed to have an idea of his own." *Id.*, at 2474; see also *ibid.* ("He would do just about anything he was told"). She described the relationship between petitioner and Rocky as follows: "Bill was completely under Rocky's spell. He hung on every word Rocky said and would do and say everything Rocky did and said. He was like Rocky's dog. Rocky would give an order and Bill would do it, no questions asked." *Id.*, at 2475. With respect to the night in question, she explained that, "Everything Bill did, he did at Rocky's direction, just like he always did when I was around the two. I saw what happened and I know

that Rocky started and finished the whole thing." *Ibid.*

Garritz's testimony was consistent with the picture of petitioner painted by other witnesses. For example, one of petitioner's teachers testified that while in elementary school petitioner consistently scored in the mid-70's on IQ tests; those scores qualified him for classes for the educable mentally retarded. *Id.,* at 2178 (May 30, 1989). His teachers also described him as "slow," a "follower" who was "always . . . eager to please." *Id.*, at 2185, 2186, 2185; see also *id.*, at 2191–2192. A psychologist and a psychiatrist who examined him both described him as showing signs of brain damage, *id.*, at 2510, 2513, 2516, 2523 (June 1, 1989); see also *id.*, at 2570–2571, 2577, and a psychiatrist testified that "the kind of disorder [petitioner] has, he's easily led and felt very threatened by the co-defendant," *id.*, at 2564; see also *id.*, at 2602 ("There is no doubt in the world that this man basically appeared to be a rather—rather dependent person who tends to follow the leader. He is not a leader himself. So, whatever Mr. Surace says, he probably goes along with it"). After hearing this evidence, the jury recommended a death sentence by a vote of 7 to 5.

I refer to the evidence only to point out that it is fair, not unfair, to take account of the delay the State caused when it initially refused to allow Thompson to present it at the punishment phase of his trial. I would add that it is the punishment, not the gruesome nature of the crime, which is at issue. Reasonable jurors might, and did, disagree about the appropriateness of executing Thompson for his role in that crime. The question here, however, is whether the Constitution permits that execution after a delay of 32 years—a delay for which the State was in significant part responsible.

I believe we should grant the writ to consider that question.