

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. AP-76,594 & AP-76,595

### STATE OF TEXAS EX REL. CRAIG WATKINS, Relator

### v.

### THE HONORABLE JOHN CREUZOT, Respondent

### ON MOTION FOR LEAVE TO FILE PETITION FOR WRITS OF
### PROHIBITION AND MANDAMUS FROM CAUSE NO. F81-01988-FK
### IN THE CRIMINAL DISTRICT COURT NO. 4
### DALLAS COUNTY

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and WOMACK, JOHNSON and ALCALA, JJ., joined. KEASLER, J., filed a concurring opinion in which MEYERS and HERVEY, JJ., joined. PRICE, J., filed a dissenting opinion.

### O P I N I O N

The State of Texas, acting through Craig Watkins, the elected District Attorney of Dallas County, filed a petition for a writ of mandamus and prohibition to require the trial judge in this pending retrial of a capital murder to vacate his order precluding the State from seeking the death penalty. Jonathan Bruce Reed, the defendant and real party in interest,

filed a "Motion to Preclude the Death Penalty Because the Delay Caused by the State's Misconduct has Made a Constitutionally Adequate Sentencing Investigation Impossible." After several evidentiary hearings, the trial judge–the Respondent–granted that motion. Because we conclude that the trial judge does not have the legal authority to preclude the State from seeking the statutorily authorized punishment of death set out in Article 37.071[1] under these circumstances, we conditionally grant mandamus relief.

I.

**A.      The Trial**

1.      *Facts*

In 1979, a jury convicted Reed of capital murder by intentionally killing Wanda Wadle during a robbery or aggravated rape. The trial judge sentenced him to death, but then granted Reed's motion for new trial without explanation. A second jury convicted him of capital murder in 1983, and once again he was sentenced to death.

The evidence from that second trial[2] showed that Wanda Wadle shared a Dallas apartment with her sister and a friend, Kimberly Pursley. All three were flight attendants for Braniff. On November 1, 1978, Kimberly came home from a lunch with her father and noticed Wanda's suitcase near the front door and her purse lying on the sofa with its contents scattered about. She concluded that Wanda had returned home sooner than expected from

---

[1] TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1); TEX. PENAL CODE § 12.31.

[2] These facts are taken from this Court's opinion on direct appeal. *Reed v. State*, No. 69,292 (Tex. Crim. App. March 29, 1995) (not designated for publication).

her last flight. Kimberly then heard a male voice coming from behind a closed bedroom door: "Don't come in here. Stay out there." Thinking that the man was a friend of Wanda's, she said, "Don't worry, I won't come in."

Soon Reed opened the bedroom door. Kimberly saw him leaning through the doorway with one hand on the molding and snapping a knife sheath closed with the other. He said, "I'm with maintenance; I came to check and change the air conditioner filters," and he pointed toward the bedroom ceiling. Kimberly looked into the bedroom and saw Wanda's nude body protruding spread-eagle from beneath the bed. As she turned toward Reed, he grabbed her by the throat with both hands and threw her to the living room floor on her stomach, saying "Don't move or I'll break your f. . .ing neck."

Kimberly heard Reed rummaging through the bedroom and then he returned and gagged her with a Braniff uniform sash, tied her hands with a leather belt, and covered her head with an apron. He then asked her, "Do you have any money?" She indicated that she did, so he took $20 from her purse and rummaged through the apartment some more. Reed then returned to Kimberly, straddled her with his legs, and began choking her with both his hands. She feigned unconsciousness. He finally stopped choking her and left.

Kimberly then ran screaming out of the apartment to find help. One neighbor found Wanda lying naked on her back with her legs spread apart. The neighbor pulled Wanda out from under the bed, removed a plastic bag and belt from around her neck, and began CPR, but Wanda died nine days later without regaining consciousness. Two neighbors had seen

Reed in the complex shortly before the attack, and a maintenance man, who had seen him after the attack, identified Reed, as did Kimberly.

Reed testified at trial and presented an alibi defense.  At the punishment phase, Reed presented four types of mitigating evidence: (1) his prior good conduct in prison in which he had earned a G.E.D. and completed twenty-two hours of college credits; (2) evidence of a history of non-violent prior crimes (including evidence that Reed was the leader and director of a "pack of juveniles" who committed a string of fifteen to twenty home burglaries in 1978) which, it was argued, demonstrated that he was unlikely to be violent in the future; (3) his turbulent family background (including evidence that he did not finish high school, that he went to the penitentiary at age nineteen, that his step-mother married his father when Reed was twenty-four, and that he had no permanent home at the time of the murder); and (4) psychiatric experts who said that, even if Reed had a "sexually deviant, anti-social personality disorder," he would experience a violence "burnout" between the ages of thirty and forty.

2.    *Jury Selection*

During the 1983 trial, Reed's counsel objected to the prosecutor exercising peremptory challenges against five African-Americans.[3]  When the prosecutor struck the very first venireperson, Ms. Osby, the defense wanted the prosecutor to state his reason for doing so, because he "believe[d] it was done strictly for discriminatory and racial reasons."  The

---

[3] These facts are taken from this Court's 1992 abatement order for a *Batson* hearing. *Reed v. State*, No. 69,292 (Tex. Crim. App. Nov. 18, 1992) (not designated for publication).

trial judge told counsel that, in light of his understanding of the law, he could not order the State to do that because they were free to exercise their challenge for "any reason whatever."[4] The prosecutor then responded, saying (1) the law did not require him to give any reason for exercising a peremptory challenge; (2) he "did not exercise a peremptory because of her being a black female"; and (3) the defendant was not black. The trial judge then asked defense counsel to provide him with caselaw from "Texas or some federal jurisdiction" that supported his position. Defense counsel did not provide any authority then or later during the trial. He objected to the State's peremptory challenges to four other black venirepersons as well.

**B.**      **The Appeals: 1983-2009**

After Reed was convicted and sentenced to death, he appealed to this Court. During the pendency of that appeal, the United States Supreme Court decided *Batson v. Kentucky,*[5] in which the Court held that the State may not use peremptory challenges solely on account of the juror's race or on the assumption that black jurors as a group will be unable to impartially consider the State's case against a black defendant.[6] Thus, once the defendant made a prima facie showing of racial discrimination, the State was required to come forward

---

[4] This trial was in 1983, three years before the Supreme Court's seminal *Batson* decision.

[5] 476 U.S. 79 (1986).

[6] *Id.* at 86 ("The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors.") (internal citation omitted).

with a race-neutral reason for that challenge.[7]  But *Batson* did not deal with Reed's situation

because he was white and *Batson*, on its face, applied only to the exclusion of black jurors

in a case against a black defendant.  This Court did not address Reed's *Batson* claim until

after the 1991 Supreme Court decision, *Powers v. Ohio*,[8] ruling that a defendant had standing

to object to raced-based peremptory challenges even when he was not of the same race as

those jurors.[9]  Thus, white defendants could object to the discriminatory exclusion of black

jurors, and black defendants could object to the discriminatory exclusion of white jurors.[10]

Based on these two new decisions, this Court abated Reed's appeal in late 1992 and

remanded it to the trial court to conduct a retroactive *Batson* hearing.  By then–ten years after

the trial–neither the prosecutor nor the trial judge had any independent memory of the voir

dire or jury selection.[11]  Both the trial judge and the prosecutor read and referred to the voir-

---

[7] *Id.* at 97-98 ("Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. . . . [T]he prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption-or his intuitive judgment-that they would be partial to the defendant because of their shared race. . . . Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.'") (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

[8] 499 U.S. 400 (1991).

[9] *Id.* at 408-12.

[10] *See id.*

[11] These facts are taken from this Court's direct appeal opinion.  *Reed v. State*, No. 69,292 (Tex. Crim. App. March 29, 1995) (not designated for publication).

dire transcript for the five challenged venire persons.[12]  For each of the five, the State gave race-neutral reasons for striking that juror, and the trial judge accepted those reasons as being both credible and racially neutral.  When the case returned to this Court, we upheld the trial judge's ruling and rejected Reed's *Batson* claims, along with his other points of error.

After this Court affirmed Reed's conviction and sentence in 1995, the Supreme Court denied *certiorari* in 1996.[13]  Reed then filed an application for a post-conviction writ of habeas corpus in the convicting court, and we adopted the judge's findings of fact and denied relief in 1998.[14]  In 1999, the United States Supreme Court again denied *certiorari*.[15]

Later in 1999, Reed filed a petition for writ of habeas corpus in the federal district court.  He included his *Batson* claim that the trial judge and this Court had previously rejected on direct appeal.  The magistrate judge recommended that relief be denied and, on

---

[12] In our direct appeal opinion, we stated: "When appellant called the trial court to the stand, the trial court admitted it did not read the entire record of the voir dire, that it had only reviewed the transcript of the voir dire of the five veniremembers in question."  Slip op. at 24.  The defense did not ask the trial judge to read the rest of the voir dire record and did not ask him to make any comparative analysis of the reasons proffered by the prosecution.  The defense did, however, make a supplemental post-abatement claim that the trial judge erred in failing to make a comparable analysis which this Court rejected as it was not preserved in the trial court.  *Id.* at 26-27.  However, this Court did note that the prosecutor "indicated that there were not single factors that stood alone in his, or [his fellow prosecutor's], decisions to exercise peremptory strikes on the five veniremembers.  He explained it was the combination of beliefs and answers, including how far along he was in voir dire, that led him to exercise peremptory strikes.  This mix of factors does not lend itself to simplistic disparate treatment analysis."  *Id.* at 29 n.8.

[13] *Reed v. Texas*, 516 U.S. 1050 (1996).

[14] *Ex parte Reed*, No. 38,174-01 (Tex. Crim. App. Sept. 16, 1998) (not designated for publication).

[15] *Reed v. Texas*, 526 U.S. 1021 (1999).

February 19, 2003, the district judge agreed. Reed filed a motion to disqualify the magistrate, which was granted, and the Fifth Circuit later abated the case for a new federal district judge to reconsider Reed's claims. That judge denied all of Reed's claims on July 26, 2005, but he granted a Certificate of Appealability on the *Batson* claim.

Three years later, the Fifth Circuit concluded that, based upon *Miller-El v. Dretke*,[16] an intervening 2005 decision by the Supreme Court, Reed was entitled to relief on his *Batson* claim.[17] *Miller-El* allowed the federal reviewing courts to use a comparative analysis of the voir dire of all of the prospective jurors in analyzing a state-court *Batson* claim even though the state trial judge had never been requested to do so and the state court had not done so on direct appeal.[18] The Fifth Circuit noted that although "we do not relish adding a new chapter to this unfortunate story more than thirty years after the crime took place, we conclude that the Constitution affords Reed a right to relief."[19] On January 12, 2009, the Fifth Circuit ordered that Reed be released or retried on the 1978 capital murder charges.

II.

In his pretrial motion, Reed complains that the State should not be allowed to seek the death penalty in the retrial because it was the State's fault that it took thirty years for the

---

[16] 545 U.S. 231 (2005).

[17] *Reed v. Quarterman*, 555 F.3d 364, 370-82 (5th Cir. 2009).

[18] *Miller-El*, 545 U.S. at 241 & n.2.

[19] *Reed*, 555 F.3d at 382.

appellate orbit to play itself out in his favor and, in the meantime, some potentially mitigating evidence has become unavailable. Some witnesses have died and some records from his childhood have been destroyed or lost. Reed argues that, "in the unique factual circumstances of this case, no verdict imposing a death sentence could satisfy the exacting standard of reliability imposed by the federal constitution."[20] His due process rights were violated because he could no longer mount a full defense and his attorneys could not provide effective assistance of counsel because, even with a diligent investigation, they could not bring forward mitigating evidence that no longer exists.

After several evidentiary hearings about the unavailability of certain witnesses and records, the trial judge granted Reed's motion. He signed a fifty-two page order that concluded:

> Applying all of the facts found by the Court to the legal conclusions above, the Court concludes that the Defendant's defense team cannot conduct a constitutionally adequate mitigation investigation and that the State must therefore be precluded from seeking death in his trial.[21]

For legal authority, Reed relied upon a purported unpublished ruling by a Philadelphia trial court in *Commonwealth of Pennsylvania v. Wilson*. But Reed attached only the Pennsylvania defendant's motion for reconsideration, which was apparently filed after the trial judge had originally denied the defense motion to preclude a capital-murder retrial. We

---

[20] Response in Opposition by Real Party in Interest at 20.

[21] Trial Court's Findings of Fact and Conclusions of Law Regarding the Defendant's Motions to Preclude the Death Penalty at 51.

are unable to find any further rulings or appellate decisions in that case, but an unpublished Pennsylvania trial court ruling is not precedential authority in any event.

The State argues that the trial judge lacked any legal authority to grant Reed's motion to preclude the State from exercising its discretionary right to seek the death penalty in this retrial. The State also argues that this very same due-process claim was rejected in 2007 by the Fifth Circuit in one of Reed's previous federal appeals.[22] The State further argues that the trial judge has, under *State of Texas ex rel. Lykos v. Fine*,[23] unlawfully ruled upon the adequacy of Reed's mitigation case before he has been tried, convicted, or sentenced.

Based upon the filings that are before us, we conditionally grant the State mandamus and prohibition relief because it has established both that (1) it has no other adequate legal remedy; and (2) it has a "clear right to the relief sought" and the merits of its legal position are "beyond dispute."[24]

## A.    No Adequate Remedy at Law

Here, as in *Lykos v. Fine*, the State argues that it has no adequate remedy at law to correct what it contends is a legally erroneous and unauthorized pretrial advisory ruling precluding the State from seeking the death penalty in this case.[25] As we have explained, the

---

[22] *See Reed v. Quarterman*, 504 F.3d 465, 484-88 (5th Cir. 2007).

[23] 330 S.W.3d 904 (Tex. Crim. App. 2011).

[24] *Lykos v. Fine*, 330 S.W.3d at 907.

[25] *See id.* at 913.

State "cannot appeal such a ruling because there is no statutory provision to allow the State to appeal such a pretrial advisory ruling."[26]  Article 44.01 simply "does not authorize the State to appeal from a pretrial ruling on a possible punishment issue that fails to dismiss any part of the actual indictment,"[27] and the judge's order in this case does not purport to dismiss any portion of the indictment.  Thus, here, as in *Lykos v. Fine*, we conclude that a writ of mandamus or prohibition is an appropriate vehicle to review the propriety of Reed's pretrial motion and the trial judge's order.[28]

**B.      A Clear Right to Relief**

As in *Lykos v. Fine*, the defendant in a pending capital-murder prosecution is attempting to prevent the State from seeking the death penalty via a pretrial evidentiary hearing and ruling.[29]  As in *Lykos v. Fine*, Reed is seeking a declaratory judgment that *if* he goes to trial, and *if* he is found guilty, then it would violate his constitutional rights for the State to even seek the death penalty as a sentence.  Unlike the situation in *Lykos v. Fine*, however, Reed is not attacking the constitutionality of the Texas death-penalty statute, either facially or as applied.  His claim is based solely upon specific historical facts unique to him unrelated to Article 37.071: He did not obtain relief in the appellate courts for thirty years,

---

[26] *Id.*

[27] *Id.* at 914.

[28] *Id.* at 916.

[29] *Id.*

and, because of this lengthy delay, he has lost access to certain witnesses and documents that might have assisted him in a punishment mitigation case.

1.      *The Due-Process Claim*

The problem with Reed's legal position is that the United States Supreme Court has not recognized a due-process claim that would preclude a retrial (or preclude the availability of a particular punishment) after a lengthy delay on appeal. The Fifth Circuit noted this lack of constitutional authority when it rejected Reed's same claim in 2007. There, Reed claimed that "he was denied due process by the extended delay in the Texas Court of Criminal Appeals' resolution of his direct appeal."[30]

Of course, if this Court had resolved his direct appeal earlier (say in 1985 before *Batson* was decided), then his *Batson* claim would have been rejected out of hand because that Supreme Court ruling had not yet made new constitutional law. And, if Reed's direct appeal were not still pending at the time *Batson* was decided, he also could not have obtained relief via a later writ of habeas corpus.[31]

Similarly, if this Court had resolved his direct appeal before the 1991 Supreme Court decision in *Powers*, which changed the underlying *Batson* rationale and focus from the defendant to the prospective jurors and allowed white defendants to assert a *Batson* claim

---

[30] *Reed v. Quarterman*, 504 F.3d at 484.

[31] *See Teague v. Lane*, 489 U.S. 288, 311-16 (1989) (defendant whose conviction became final prior to *Batson* decision could not obtain relief on habeas corpus; the "new" constitutional rule set out in *Batson* is not to be applied retroactively on habeas corpus collateral attacks because it is not a "bedrock procedural element").

when members of any distinct racial group are struck on the basis of race, Reed would not have been able to take advantage of that new aspect of *Batson*.

And finally, if Mr. Reed's appeals had been completed before the Supreme Court decision in *Miller-El* in 2005, allowing federal reviewing courts to make a "comparative analysis" of all jurors even though the state trial judge was never asked to do so, he could not have ultimately obtained relief under that 2005 decision.

Mr. Reed's trial and appellate attorneys should be commended for both their prescience and diligence over the long haul, but it is only because the United States Supreme Court changed the constitutional landscape over the almost thirty years that his conviction was on appeal that Mr. Reed ultimately obtained a new trial. Had the appellate process worked without delay, Mr. Reed would not be getting a second bite of the apple. In sum, this is not an instance in which the State intentionally ignored or flouted established law to obtain a conviction. This is not a case in which the trial judge ignored then-existing law. Indeed, the trial judge said that he did not have the legal authority to ask the prosecutor to explain the basis for his peremptory challenges (and he was legally correct in making that statement in 1983), but invited defense counsel to show him a case that gave him such authority.[32] The

---

[32] The experienced trial judge told defense counsel: "I'm not aware of any Texas law or even Fifth Circuit law that permits me to make the State state its reasons for exercising a peremptory challenge. . . There are Texas cases which indicate that the Defense can establish that the State is exercising its challenges in a discriminatory manner and it may be error—I didn't read all of those cases but I did read a couple of them and, for whatever value it is, those appeared to involve a black defendant and excluding black jurors. If the record doesn't show it, I think the evidence is that Mr. Reed is, of course, a white male."

present situation exemplifies the problems when the parties and judge try a case under then-existing law only to see that law undergo dramatic changes in the fullness of time. But, fortunately for Mr. Reed, he doggedly persevered with his various state and federal appeals until the law changed sufficiently that he was entitled to a new trial.[33]

But he is not entitled to more relief than a new trial. As the Fifth Circuit noted in rejecting Mr. Reed's due-process claim, "there is no Supreme Court decision holding that excessive delay in a direct appeal is a violation of the Due Process Clause of the United States Constitution."[34] In his motion and briefs to both the trial court and to this Court, Mr. Reed has not cited a single Texas or federal case in which the State has been precluded from seeking the death penalty (or any other specific punishment) based on delay in obtaining an

---

[33] The federal district judge, in rejecting Mr. Reed's due process claim based on appellate delay, also noted that the delay had helped, not hindered, him in his *Batson* claims. *See* 504 F.3d at 485.

[34] *Id.* The Fifth Circuit did note that several federal circuits have opined that "excessive appellate delay" could violate the Due Process Clause. *Id.* at 486. For example, in *Cody v. Henderson*, 936 F.2d 715, 718 (2d Cir. 1991), the Second Circuit stated,

> The Supreme Court has not yet directly addressed the issue of whether the Constitution guarantees a speedy criminal appeal, once an opportunity for an appeal is provided. The lower federal courts, however, have grappled with the question, and it is now clear in this circuit that substantial delay in the state criminal appeal process is a sufficient ground to justify the exercise of federal habeas jurisdiction.

In *Cody*, the court found that the nine-year delay in the resolution of the state appeal (primarily because the court reporter failed to create a transcript of the trial) raised a cognizable claim in a federal habeas corpus proceeding. However, the normal remedy for such a due-process violation is an order requiring the state court to resolve the appeal expeditiously. *Id.* at 721.

ultimately successful appeal.[35]   Indeed, the Supreme Court, in the context of a speedy trial

claim, has stated that "[a] defendant with a meritorious appeal would bear the heavy burden

of showing an unreasonable delay caused by the prosecution in that appeal, or a wholly

unjustifiable delay by the appellate court."[36]  Reed has not shown that the delay occasioned

by his ultimately successful appeal was unjustifiable.  He prevailed precisely because of that

delay.[37]

2.     *Unavailable Evidence Claim*

Reed argues that (1) he has suffered a Sixth Amendment violation of his counsel's

investigative function because, despite their remarkable diligence, they have determined that

some possibly mitigating evidence is no longer available; (2) his counsel's inability to mount

---

[35] *See Bell v. State*, 938 S.W.2d 35, 53 (Tex. Crim. App. 1996) (capital murderer's retrial and re-sentencing after twenty years on death row did not violate Eighth Amendment; "any delays have resulted from appellant's legitimate entitlement to the benefits of appellate review of his death sentence. The existence of delays in appellant's case have arguably been necessary to ensure that his conviction and sentence are proper and not inhumane. Although the federal constitution protects citizens against State abuses, it does not and cannot protect them against those costs which are necessary and inherent in the exercise of the rights it guarantees."). Justice Thomas has stated, "I am unaware of any support in the American constitutional tradition or in [the Supreme Court's] precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight v. Florida*, 528 U.S. 990, 990 (1999) (Thomas, J., concurring).

[36] *United States v. Loud Hawk*, 474 U.S. 302, 316-17 (1986) ("'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendants are not now able to criticize the very process which they so frequently called upon.'") (quoting *United States v. Auerbach,* 420 F.2d 921, 924 (5th Cir. 1969)).

[37] Courts that have considered a "speedy appeal" issue on a writ of habeas corpus have focused on whether the delay rendered the convicted person's appeal nothing "more than a meaningless ritual." *See, e.g., Chatman v. Mancill*, 626 S.E.2d 102, 111 (Ga. 2006).  The delay in Reed's case did not render his appeal a "meaningless ritual" because he prevailed.

a complete defense based upon the present availability of all potential mitigating evidence violates the Eighth Amendment; and (3) the federal constitution demands consideration of mitigating evidence and without evidence of Reed's childhood and youth no reliable sentencing verdict is possible.

The State argues that its writ petition "is not about Reed's case in mitigation. It is about whether a trial court may preclude the death penalty for a death-eligible offense based upon a contingency." That contingency is the assumption that Reed would be found guilty of capital murder, that a jury would find, beyond a reasonable doubt, that he would still be a future danger, and that, because some witnesses and records from his childhood and youth are unavailable, a hypothetical jury would not answer the mitigation question in his favor.

Both the State and Reed rely upon *State v. Azania*,[38] a decision by the Indiana Supreme Court that is analogous to the present case. In *Azania*, the defendant was convicted of a 1981 capital murder. The state supreme court set aside the recommendations of two juries that Azania should receive the death penalty. The trial court then ruled that, given the twenty-five year appellate delay in the case, Azania's constitutional rights to a speedy trial and due process would be violated if the State continued to seek a death sentence.[39] The Indiana Supreme Court, in an interlocutory appeal by the State,[40] disagreed and found that

---

[38] 865 N.E.2d 994 (Ind. 2007).

[39] *Id.* at 996.

[40] Indiana law apparently permits such an interlocutory appeal by the State as the court simply stated that the case was before it "on the State's appeal" without further discussion of its

"neither the delay nor any prejudice that Azania may suffer from it violates his constitutional rights."[41]  Thus, the State could continue to seek the death penalty.

The Court noted that Azania's claim appeared to be a "novel" one in capital litigation, but it noted that two other state courts had rejected similar claims with little discussion.[42] The Indiana Supreme Court noted that delay "'may work to the accused's advantage,'" especially in capital litigation.[43]  The court held that, because most of the delay was occasioned by Azania's appeals (which he bore the burden of going forward with) and he made no showing that the State affirmatively "hampered his ability" to prosecute those appeals, it would not attribute any delay in the appellate process to the State.[44]

Azania, like Reed, claimed that the twenty-five-year delay had resulted in the

---

jurisdiction.  *Id.* at 997. *See also State v. Lewis*, 883 N.E.2d 847, 851 (Ind. Ct. App. 2008) (State's interlocutory appeal permitted by IND. R. APP. P. 14).

[41] *Id.*

[42] *Id.* at 999 (citing *Hitchcock v. State*, 673 So.2d 859, 863 (Fla. 1996), and *Moore v. State*, 436 S.E.2d 201, 202 (Ga. 1993)); *see also Rose v. State*, 787 So.2d 786, 805 (Fla. 2001) (rejecting capital-murder defendant's claim that his death sentence on a retrial was cruel and unusual punishment because of the lengthy delay between his first death sentence and the retrial some 20 years later).

[43] *Id.* (quoting *Barker v. Wingo*, 407 U.S. 514, 521 (1972)). The court explained that the appellate process in capital litigation "'takes so long because there is a concerted effort afoot to slow it down, and because our legal system requires scrupulous review before a death sentence can be carried out.'"  *Id.* at 999-1000 (quoting Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 CASE W. RES. L. REV. 1, 25 (1995)).

[44] *Id.* at 1003.

unavailability of important mitigation witnesses.[45]   But, as the court noted, many of the State's witnesses were also now unavailable, and the State bears the burden of proof at the guilt stage, and it must also prove, beyond a reasonable doubt, the aggravating circumstances during the punishment phase. While the unavailability of the defense witnesses and evidence "may make it more difficult for Azania to defend against the State's case, we find that it creates far greater difficulty for the State to meets its burden of proof."[46] The *Azania* court noted that the Supreme Court has said that "'delay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry out this burden.'"[47] The same is true in the present case.

Reed offered significant mitigation evidence in the 1983 trial and, if the witnesses who testified at that trial are presently unavailable, he may offer their former testimony.[48] Reed argues that many of his school records, psychiatric records, and TYC records are no

---

[45] *Id.* at 1006. Azania's counsel noted that Azania's mother and his aunt had both died, as well as his prior spiritual advisor. "[M]any people with whom Mr. Anzania worked in the community around public interest issues prior to his arrest cannot be found. Even if they could, the value of their testimony concerning Mr. Azania's achievements will be substantially reduced because of the passage of time." *Id.* at 1008.

[46] *Id.* at 1009.

[47] *Id.* at 1010 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)).

[48] TEX. R. EVID. 804(b)(1).

longer available simply because of the passage of so much time.[49]  But that would likely be true for any sixty-year-old defendant in a capital-murder trial.  The fact that Reed might not be able to present his mitigation case (if he is found guilty in the retrial) in precisely the form he would prefer does not violate his constitutional rights.[50]

The evidentiary hearings on Reed's motion focused solely on evidence that Reed says he cannot now present, not on what evidence was still available or what evidence is now available that did not exist at the time of the 1983 trial.  Nor did those hearings develop how certain "missing" primary evidence could be presented in another form or through other witnesses.  To the extent that the trial judge's factual findings are based on those evidentiary hearings, they are incomplete and largely hypothetical.

Furthermore, not all mitigation evidence is created equal.  While evidence of childhood difficulties, a turbulent upbringing, youthful crimes and psychiatric diagnoses are certainly relevant and admissible in the punishment phase of a sixty-year-old man (should there be a verdict of guilty), that evidence might pale in significance to the evidence of more recent behavior, beliefs, and attitudes.  A young man with a long record of adolescent crime

---

[49] There is no evidence in this case that the State intentionally destroyed these records in bad faith so that they would not be available to Reed. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) (holding that the destruction of "potentially useful" evidence does not amount to a due process violation without a showing that the State acted in "bad faith").

[50] *See Valle v. State*, 109 S.W.3d 500, 507 (Tex. Crim. App. 2003) ("The fact that [the capital-murder defendant] was not able to present his [mitigation] case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury.").

(such as Reed had) may have to rely upon explaining the genesis and rationale for that conduct and hope that the jury may sympathize with his incorrigibility. An older man may show that he has changed his spots and is no longer a danger to others. For example, the psychiatrists testified in the 1983 trial, that even a "sexually deviant" man with "anti-personality disorder" would experience a violence "burnout" between the ages of thirty and forty. Reed now has available evidence of the past thirty years in which his character may have altered dramatically for the better. Evidence of present rehabilitation, redemption, and remorse may be significantly more powerful mitigation evidence than tales of a troubled childhood some forty to fifty years ago. Reed now has the opportunity to persuade the jury that he has risen, like Phoenix from the ashes, and become a wholly different person than the man he was in 1978.

It is the State's burden to prove that Reed would still constitute a future danger to society, and that would be a heavy burden under these circumstances. Neither Reed nor the State bear an evidentiary burden on the mitigation issue, and Reed may mount a most compelling case for mitigation as a sixty-year-old man who has overcome his prior problems and made some contribution to his society in the intervening years of reflection.[51] Given the diligence of his resourceful counsel, we do not doubt that he would be able, if necessary, to

---

[51] Reed seems to assume that all of the presently unavailable evidence from his childhood and youth would be mitigating, but that is not necessarily so. Indeed, given his extensive criminal activities during his youth, it is quite possible that the unavailable evidence would, on balance, be aggravating rather than mitigating. Sometimes remembrance of things past is not all tea and madeleines.

mount an effective mitigation case, and that a jury would make appropriate allowance for records and witnesses that are no longer available.[52]

More importantly, the issue of the adequacy of Reed's mitigation case is not ripe for review. The Supreme Court has held that the ripeness doctrine protects against "judicial interference until a[ ] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties."[53] To decide whether an issue is ripe for adjudication, we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."[54]

The issue of the adequacy of Reed's mitigation case is not "fit" for judicial decision before it is presented. Here, a capital-murder defendant is seeking a pretrial declaratory judgment that any mitigation case that he might mount would necessarily be inadequate and therefore any prospective death sentence would, if it occurred, violate the Eighth

---

[52] *See Azania*, 865 N.E.2d at 1009.

> At a new penalty phase trial, we are confident, Azania will be able to assemble a highly credible presentation of those aspects of his upbringing and community involvement that are entitled to mitigating weight. If he elects to present this evidence, we believe that the jury will make an appropriate allowance for the fact that his mother, aunt, and prior spiritual advisor are no longer living. And, of course, Azania will have the opportunity of presenting evidence of remorse, and the testimony of any current spiritual advisor and others as to his accomplishments and contributions while incarcerated.

*Id.* (internal citations omitted).

[53] *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977).

[54] *Id.* at 149.

Amendment, the Sixth Amendment, and the Due Process Clause. "These assumptions are simply not warranted before a jury has considered the evidence in the present case and rendered a verdict."[55] We do not put the cart before the horse: "a defendant has no claim of wrongful conviction or wrongful sentencing before he has even gone to trial."[56] The adequacy and efficacy of Reed's mitigation case cannot be judged unless he has actually been convicted of capital murder and sentenced to death.[57] Any pretrial determination of that mitigation case is necessarily hypothetical and unlikely to fairly reflect reality as it plays out in an actual trial. As we explained in *Lykos v. Fine*,

> A trial on the merits is "the main event" in our American system of justice in which the prosecution and defense present evidence and do battle to reach a presumptively accurate and reliable result in each particular case. At that trial on the merits "[i]f a criminal defendant thinks that an action of the state trial court is about to deprive him of a federal constitutional right there is every reason for his following state procedure in making known his objection."[58]

Finally, the dissent argues that Reed's due-process claim is analogous to that involving a pretrial challenge to an indictment based on a speedy-indictment claim. As Judge Keasler aptly points out in his concurring opinion, this situation is not analogous to that

---

[55] *See Lykos v. Fine*, 330 S.W.3d at 916.

[56] *Id.* at 917.

[57] *See id.* at 918-19 (noting that "[n]either trial judges nor judges on this Court sit as a moral authority over the appropriateness of the death penalty. We can determine only whether it has been constitutionally imposed by a jury after a specific conviction and sentence.").

[58] *Id.* at 919 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

situation.  In *United States v. Marion*,[59] the Supreme Court noted  that

> [T]he Government concede[d] that the Due Process Clause of the Fifth
> Amendment would require dismissal of the indictment if it were shown at trial
> that the pre-indictment delay in this case caused substantial prejudice to
> appellees' rights to a fair trial and that the delay was an intentional device to
> gain tactical advantage over the accused.[60]

That is a two-pronged test: First, the defense must show *at trial* that the delay did, in fact,

cause substantial prejudice to his right to a fair trial;[61] and second, the defense must show that

the government intentionally delayed its indictment for the purpose of gaining a tactical

advantage over the defendant.[62]  It is only after the defendant has shown actual–not possible

or potential–prejudice that adversely affected his defense, that the due process issue is ripe

for adjudication.[63]  As discussed above, Reed has not shown any actual and substantive

prejudice to his mitigation case because he has not yet presented it.  Second, as a matter of

---

[59] 404 U.S. 307 (1971).

[60] *Id.* at 324.

[61] In *Marion*, the Supreme Court denied relief in the pretrial setting, but noted that the defendants were not precluded from raising that claim post-trial.  *Id.* at 326 ("Events of the trial may demonstrate actual prejudice, but at the present time appellees' due-process claims are speculative and premature."); *see also United States v. Lovasco*, 431 U.S. 783, 788 n.7 (1977) ("the District Court should have deferred action on the [defendant's] motion to dismiss [for pre-indictment delay] until after trial, at which time it could have assessed any prejudice to the [defendant] in light of events at trial."); *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996) (*en banc)* (rejecting due-process claim of pre-indictment delay brought before trial on the merits; "We are aware of no reported federal appellate decision since *Lovasco* that has sustained a pretrial dismissal for preindictment delay where the statute of limitations had not run.").

[62] *Marion,* 404 U.S. at 324.

[63] *Lovasco*, 431 U.S. at 789 (explaining *Marion* and stating that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication").

law, Reed cannot demonstrate that the State intentionally or purposely delayed the appellate process in this case for the purpose of gaining a tactical advantage over him in a retrial.[64] It was Reed, not the State, who invoked those appellate procedures, and there has been no showing that the State acted in bad faith in its appellate duties.[65] It cannot be persuasively argued that the State could have, or should have, predicted the dramatic changes in the law concerning peremptory challenges between 1983 and 2005. The pre-indictment delay cases provide no support for addressing or ruling on Reed's due-process claim in a pretrial setting.

In sum, Reed has failed to offer any legal precedent or lawful authority which would support a pretrial declaratory judgment that the State should be forbidden from seeking the death penalty in a capital-murder trial when some potentially useful records and witnesses are no longer available.[66] Because there is no basis under Texas law to conduct a pretrial

---

[64] *See id.* ("proof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."); *see also Crouch*, 84 F.3d at 1514 ("[F]or preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose."); *Spence v. State*, 795 S.W.2d 743, 749-50 (Tex. Crim. App. 1990) (rejecting, after trial and sentencing, capital-murder defendant's claim of pre-indictment delay; defendant failed to prove "intentional delay that was designed to give the State a tactical advantage over him" and failed to show what harm he suffered as a result).

[65] *See Crouch,* 84 F.3d at 1514 & n.23 (noting that it need not attempt to catalogue all possible "impermissible, bad faith purposes of intentional delay," but suggesting a purpose to "harass" or render evidence favorable to the defense unavailable would be included, while delay to affirmatively strengthen the government's case would not be).

[66] Reed also cites *United States v. Quinones*, 131 F.3d 49 (2d Cir. 2002), for the proposition that a trial court may determine, in the pretrial setting, whether the government could seek the death penalty. But in that case, the defendant mounted a facial attack upon the federal

evidentiary hearing to determine the adequacy of a mitigation case in a capital-murder proceeding, we conclude that the trial judge does not have legal authority to conduct such a hearing or make such a declaratory judgment. As in *Lykos v. Fine*, "[h]e is acting beyond the scope of his lawful authority."[67]

Therefore, the State has demonstrated a clear right to relief. We conditionally grant a writ of mandamus[68] and direct the Respondent, the Honorable John Creuzot, to vacate and withdraw his order of April 20, 2011 precluding the State from seeking the death penalty in this case. The writ of mandamus from this Court will issue only if the Respondent fails to comply with this Court's directive.

Delivered: July 27, 2011
Publish

---

death penalty statute, obviating reliance upon any pretrial evidentiary factfinding. *Id.* at 58. The Second Circuit decided that this pure legal question was ripe for review precisely because it did not depend upon any facts that might be introduced at trial. Then, reviewing the legal issue *de novo*, it reversed the trial court and held that the government was entitled to seek the death penalty. *Id.* at 70.

[67] 330 S.W.3d at 919.

[68] Because we conditionally grant a writ of mandamus, we dismiss the State's petition for a writ of prohibition.